# EXHIBIT A

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

**SEP 08 2021**

Sherri R. Carter, Executive Officer/Clerk of Court

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GLAXOSMITHKLINE, LLC, a Delaware company;
SEE ATTACHED JUDICIAL COUNCIL FORM "SUM-200(A)"

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

MARLENE BOYADJIAN, individually and on behalf of the estate of
SALIBA BOYADJIAN

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* Stanely Mosk - Central District | *(Número del Caso):* 21STCV32966 |

111 N. Hill Street
Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David F. Calkins, Esq., 500 N. Brand Blvd., Suite 2000, Glendale, CA 91203 - Telephone 818.392.8222

| DATE: 9/7/2021 SEP 0 8 2021 | Sherri R. Carter, Clerk | Clerk, by | STEVEN DREW | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify)*: **CHATTEM, INC**

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☒ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Boyadjian v. GlaxoSmithKline, LLC, et al. | 21STCV32966 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware corporation; SANOFI US SERVICES, INC., a Delaware corporation; CHATTEM, INC., a Tennessee corporation; PFIZER, INC., a Delaware corporation; and DOES 1 through 50, inclusive,

Page _____ of _____

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  David F. Calkins, State Bar No. 314294
   **LAW OFFICES OF DAVID F. CALKINS**
2  500 N. Brand Blvd., Suite 2000
   Glendale, CA 91203
3  T: (818) 392-8222
   F: (888) 395-0098
4  E-Mail: david@calkinslaw.com

5

6  Attorneys for Plaintiff: MARLENE BOYADJIAN

7

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                     **COUNTY OF LOS ANGELES**

11

12  MARLENE BOYADJIAN, individually      CASE NO.: **21STCV32966**
    and on behalf of the estate of SALIBA
13  BOYADJIAN,                           **COMPLAINT AND DEMAND FOR
                                         JURY TRIAL**
14            Plaintiffs,
                                         1. Strict Products Liability-Failure to Warn
15  vs.                                  2. Strict Products Liability – Design Defect
                                         3. Negligence – Misrepresentation
16                                       4. Fraudulent Concealment
    GLAXOSMITHKLINE, LLC, a Delaware     5. Negligent Manufacturing
17  company; BOEHRINGER INGELHEIM        6. Negligence
    PHARMACEUTICALS, INC., a Delaware    7. Wrongful Death
18  corporation; SANOFI US SERVICES,     8. Survival Action
    INC., a Delaware corporation;
19  CHATTEM, INC., a Tennessee
    corporation; PFIZER, INC., a Delaware
20  corporation; and DOES 1 through 50,
    inclusive,
21
22            Defendants.
23

24

25

26

27

28
        **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
                              **- 1 -**

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 07 2021

Sherri R. Carter, Executive Officer/Clerk of Court

By: Kristina Vargas, Deputy

## INTRODUCTION

1. This is a personal injury action for damages relating to Defendants' design, manufacture, sale, marketing, advertising, promotion, testing, labeling, packaging, handling, distribution, transportation, and storage of ranitidine-containing drugs – including the brand name, Zantac, and its various generic forms ("Ranitidine-Containing Drugs," unless specially identified).

2. Plaintiffs bring this action for personal injuries suffered as a result of ingesting the defective and unreasonably dangerous Ranitidine-Containing Drugs and developing various cancers and their sequela as a result of this ingestion.

3. As more particularly set forth herein, Plaintiffs maintain that the Ranitidine-Containing Drugs ingested are defective, dangerous to human health, unfit and unsuitable to be advertised, marketed, and sold in the United States, were manufactured improperly, and lacked proper warnings of the dangers associated with their use.

4. N-Nitrosodimethylamine ("NOMA") is a potent carcinogen. Discovered as a byproduct in manufacturing rocket fuel in the early 1900s, today, its only use is to induce tumors in animals as part of laboratory experiments. Its only function is to cause cancer. It has no business being in a human body.

5. Zantac, the popular antacid medication that was used by millions of people every day, leads to the production of staggering amount of NOMA when it is digested by the human body. The U.S. Food and Drug Administration's ("FDA") allowable daily

1   limit of NOMA is 96 ng (nanograms) and yet, in a single dose of Zantac, researchers

2   are discovering over 3 million ng.

3   6.   These recent revelations by independent researchers have caused widespread

4   recalls of Zantac and its generic forms both domestically and internationally including

5
6   the domestic recall by the current owner and controller of the Zantac new drug

7   application ("NDA"). Recently, on April 1, 2020, the FDA banned all Ranitidine-

8   Containing Drugs sold in the United States.

9   7.   The high levels of NOMA observed in Ranitidine-Containing Drugs is a function

10   of the ranitidine molecule: (1) the way it breaks down in the human digestive system;

11
12   and (2) the way it breaks down when exposed to heat, in particular during transport

13   and storage.

14   8.   This lawsuit seeks to hold Defendants responsible for defective design,

15   manufacturing, sale, marketing, advertising, promotion, testing, labeling, packaging,

16   handling, distribution, transportation, and storage that caused Plaintiffs' severe

17
18   injuries.

19                                          **PARTIES**

20        **a.   Plaintiff**

21   9.   Plaintiff Marlene Boyadjian, a citizen of California and a resident in Los Angeles

22   County, seeks recovery individually and on behalf of the estate of Saliba Boyadjian,

23
24   who was her late husband and consumed Ranitidine-Containing Drugs. As a direct and

25   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Decedent

26   was diagnosed with stomach cancer and after tremendous pain, suffering, and

27

28

disability, subsequently died. His medical providers supplied Decedent with the Ranitidin-Containing Drugs which caused Plaintiffs' injuries.

10. Upon information and belief, Defendants BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware corporation; SANOFI US SERVICES, INC., a Delaware corporation; CHATTEM, INC., a Tennessee corporation; PFIZER, INC., a Delaware corporation; GLAXOSMITHKLINE, LLC, a Delaware company, and DOES 1 through 50, inclusive (collectively referenced herein as the "Defendants"), are liable for the damages sustained by Plaintiff MARLENE BOYADJIAN, individually, and on behalf of the estate of decedent Saliba Boyadjian (collectively referenced herein as the "Plaintiffs").

11. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, decedent Saliba Boyadjian was diagnosed with stomach cancer which caused his untimely death.

12. Based on prevailing scientific evidence, exposure to Ranitidine-Containing Drugs (and the attendant NOMA) can cause cancer to humans.

13. Had any Defendant warned Decedent that Ranitidine-Containing Drugs could lead to exposure to NOMA or, in turn, cancer, Decedent would not have taken Ranitidine-Containing Drugs

14. Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of and/or exposure to Ranitidine-Containing Drugs supplied and distributed by Defendants herein Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to cancer, other permanent physical deficits, permanent bodily impairment,

and other sequelae. Decedent's injuries required hospitalizations, in-patient surgeries, medications, treatments, and other therapies to address the adverse physical effects and damage caused by Decedent's use of and/or exposure to Ranitidine-Containing Drugs.

15. As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 50, inclusive, Decedent used and/or exposed Ranitidine-Containing Drugs and was diagnosed with serious health injuries including stomach cancer.

16. As a result of using and/or being exposed to Defendants' Ranitidine-Containing Drugs, Decedent and Plaintiffs have been permanently and severely injured, having suffered serious consequences from Ranitidine-Containing Drugs.

17. As a further direct and proximate result of defects in Ranitidine-Containing Drugs and the wrongful conduct, acts, omissions, and fraudulent misrepresentations, Plaintiffs suffered severe mental and physical pain and have sustained permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

18. As a further direct and proximate cause of defects in Ranitidine-Containing Drugs and the wrongful conduct acts omissions, and fraudulent misrepresentations of Defendants, Decedent required extensive emergency medical treatment health care, attention and services, thereby incurring medical, incidental, and service expenses pertaining to emergency medical treatments and procedures undertaken in efforts to maintain and/or save Decedent.

19. Plaintiffs are individuals who suffered damages as a result of injuries resulting from Plaintiffs' use and/or exposure to Ranitidine-Containing Drugs and are authorized to bring an action for the causes of action alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs, resulting from Decedent's use and/or exposure to Ranitidine-Containing Drugs. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 50, inclusive.

20. The product warning for Ranitidine-Containing Drugs in effect during the tie period Decedent used and/or was exposed to Ranitidine-Containing Drugs were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Ranitidine-Containing Drugs use and/or exposure.

21. The Defendants and DOES 1 through 50, and each of them, inclusive, did not provide adequate warning to consumers including Plaintiffs and the general public about the increased risk of serious adverse events that are described herein.

22. Had Plaintiffs been adequately warned of the potential life-threatening side effects of Defendants' and DOES 1 through 50, and each of them, inclusive, Ranitidine-Containing Drugs, Plaintiff and Decedent would not have purchased, used or been exposed to Ranitidine-Containing Drugs.

23. By reason of the foregoing, Decedent and/or Plaintiffs developed serious and dangerous side effects including stomach cancer, related sequelae, physical pain and suffering, mental anguish and loss of enjoyment of life. By reason of the foregoing, Plaintiff and/or Decedent suffered economic losses and special damages including, but

1   not limited to, loss of earning and medical expenses Plaintiffs' general and special

2   damages are in excess of the jurisdictional limits of the Court.

3   24. Plaintiffs have reviewed their potential legal claims and causes of action against

4   the Defendants and have intentionally chosen only to pursue claims based on state

5
6   law. Any reference to any federal agency, regulation or rule is solely as background

7   information and does not raise a federal question. Plaintiffs have chosen to only

8   pursue claims based on state law and are not making any claims which raise federal

9   questions. Accordingly, Plaintiffs contend that the California State jurisdiction and

10  venue is proper.

11
12  **B. Defendants**

13  25. Defendant GlaxoSmithKline, LLC ("GSK"), is a Delaware limited liability

14  company with its principal place of business located at 5 Crescent Drive, Philadelphia,

15  Pennsylvania, 19112 and Five Moore Drive, Research Triangle, North Carolina, 27709.

16  GSK is a citizen of Delaware. GSK is a wholly owned subsidiary of GlaxoSmithKline,

17
18  plc, which is its sole member. At all relevant times, GSK has conducted business and

19  derived substantial revenue from its manufacturing, advertising distributing, selling

20  and marketing of Zantac within the State of California and Los Angeles County.

21  26. GSK, and its predecessors, have controlled the prescription Zantac NDAs since

22  1983.

23
24  27. Defendant, Pfizer, Inc. "(Pfizer"), is a Delaware corporation with a principal

25  place of business located at 235 East 42nd Street, New York, New York 10017. Pfizer is a

26  citizen of Delaware and New York and is not a citizen of ang other state. In 1993, Glaxo

27  Wellcome, plc formed a joint venture with Warner-Lambert, Inc. to develop and obtain

28

CTC approval for Zantac. In 1995, NDA 20-520 Zantac OTC 75 mg tablets were approved. In 1998, NDA 20-745 OTC Zantac 75 mg effervescent tablets were approved. Also, in 1998m Warner-Lambert and Glaxo Wellcome ended their joint venture, with Warner-Lambert retaining control over the OTC NDA for Zantac and the Zantac trademark in the United States and Glaxo Wellcome retaining control over the Zantac trademark internationally. In 2000, Pfizer acquired Warner-Lambert and maintained control over the Zantac OTC NDA until December 2006. At all relevant times, Pfizer has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling and marketing of Zantac within the State of California and Los Angeles County.

28. Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 900 Rodgebury Road, Ridgefield, Connecticut 06877. Boehringer Ingelheim Pharmaceuticals, Inc. is a citizen of Connecticut and Delaware, and not of any other state. Boehringer Ingelheim Pharmaceuticals, Inc. is a subsidiary of the German company Boehringer Ingelheim Corporation. Boehringer Ingelheim Pharmaceuticals, Inc. owned and controlled the NDA for the OTC Zantac between December 2006 and January 2017, and manufactured and distributed the drug in the United States during that period. At all times relevant, Boehringer Ingelheim Pharmaceuticals, Inc. has conducted business and derived substantial revenue from its manufacturing, advertising, distribution, selling, and marketing of Zantac within the State of California and Los Angeles County.

29. Defendant Sanofi US Services, Inc., is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and

is a wholly owned subsidiary of Sanofi S.A. Sanofi is a citizen of Delaware and New Jersey and is not a citizen of any other state. Sanofi controlled the NDA and OTC Zantac starting in January 2017 through the present and manufactured and distributed the drug in the United States during that period. Sanofi voluntarily recalled all brand name OTC Zantac on October 18, 2019. At all relevant times, Sanofi has conducted business and derived substantial revenue from its manufacturing, advertising, distribution, selling, and marketing of Zantac within the State of California and Los Angeles County.

30. Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th street, Chattanooga, TN 37409. Defendant Chattem is a citizen of Tennessee. Defendant Chattem is a wholly owned subsidiary of Defendant Sanofi SA.

31. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendants DOES 1 through 50, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sues said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when ascertained.

**JURISDICTION AND VENUE**

32. This Court has jurisdiction over this action pursuant to the California Constitution Article VI, Section 10, which granted the Superior Court "original jurisdiction in all causes except those given by statute to other trial court." The Statutes under which this action is brough do not specify any other basis for jurisdiction.

33. This Court has personal jurisdiction over each Defendant insofar as each Defendant is authorized and licensed to conduct business in the State of California a resident of the State of California, maintains and carries on systematic and continuous contacts in the State of California, regularly transacts business within the State of California, and regularly avails itself of the benefits of the State of California.

34. Additionally, Defendants caused tortious injury by acts and omissions in this judicial jurisdiction and caused tortious injury in this jurisdiction by acts and omissions outside this jurisdiction while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this jurisdiction.

35. Plaintiffs seek relief that is within the jurisdictional limits of the Court.

**FACTUAL ALLEGATIONS**

**a. Brief History of Ranitidine and Zantac**

36. Scientist John Bradshaw originally discovered and developed Zantac (ranitidine) on behalf of GSK in 1976.[1]

37. Zantac has been sold to consumers since the early 1980's, first by prescription and later as an over-the-counter ("OTC") medication.

38. The drug is a class of medication called histamine H2-ceceptor antagonists (H2 blockers), which decrease the amount of acid produced by cells in the lining of the stomach. Other drugs within this class include cimetidine (Tagamet), famotidine (Pepcid), and nizatidine (Tazac).

39. Cimetidine (Tagamet), discovered a developed by Smith, Kline and French[2], was the first H2 blocker to be developed and is the prototypical histamine H2 receptor antagonist from which the later members of the class were developed. Indeed, Zantac was specifically developed by GSK in response to the success of cimetidine.

40. Zantac was approved by the FDA, pursuant to the New Drug Application ("NDA") process in 1983 (NDA 18-703) and, quickly, became one of GSK's most successful products, being the first prescription drug in history to reach $1 billion in sales.

---

[1] Dr. Bradshaw was working for Glaxo Inc. at the time, which later merged with the Wellcome Foundationin 1995 to become Glaxo Wellcome plc. Then, in 2000, Glaxo Wellcome plc merged with Smithkline Beecham plc to form GlaxoSmithKline plc.

[2] Smith, Kline and French later merged with the Beecham Group in 1989 to form SmithKline Beecham plc. And, SmithKline Beecham plc was merged in GSK in 2000.

41. In 1993, GSK entered into a joint venture with Pfizer[3] to develop an OTC version of Zantac. That joint venture led to FDA approval of an OTC version of Zantac in 1995. Zantac OTC was approved through an NDA process (NDA 20-520).

42. In 1997, GSK's patent on ranitidine expired, and generic Ranitidine-Containing Drugs entered the market. Despite generic entry, however, rand name prescription and OTC Zantac continued to be sold. Although sales of brand-name Zantac declined as a result of generic products, Ranitidine-Containing Drug sales in the United States, with sales of Zantac 150 totaling $128.9 million – a 3.1% increase from the previous year.

43. In 1998, the joint venture between GSK and Pfizer dissolved. As part of the separation, GSK retained the rights to sell all forms of Zantac internationally and prescription Zantac in the U.S., while Pfizer retained the rights to sell OTC Zantac domestically and retained ownership over the Zantac trademark. Under the agreement, GSK retained control and responsibility over the prescription Zantac NDA and Pfizer retained control and responsibility over the OTC Zantac NDA.

44. In October 2000, Pfizer obtained full rights to OTC Zantac in the United States and Canada from GSK per an agreement. As part of the agreement, GSK divested all domestic Zantac OTC assets to Pfizer including all trademark rights and removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac. GSK retained the right to exclusive use of the Zantac name fro an prescription ranitidine-containing product in the US.

---

[3] The joint venture was between Glaxo Wellcome plc and Warner-Lambert, Inc. Warner-Lambert was later acquired by Pfizer, Inc. in 2000. For the purpose of the Complaint, Warner-Lambert is referred to as Pfizer.

45. In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg. The FDA approved NDA 21-698 OTC Zantac 150 mg on August 31, 2004.

46. In 2006, Pfizer transferred all assets pertaining to Zantac OTC line of products to Boehringer Ingelheim Pharmaceuticals, Inc. Per the terms of the deal, Boehringer obtained control and responsibility over all of the Zantac OTC NDAs.

47. In 2016, Boehringer sold the rights of OTC Zantac to Sanofi US Services, Inc. Sanofi controlled the NDAs for OTC Zantac and marketed, distributed, and sold Zantac in the United States from January 2017, until the FDA issued a recall in 2019.

### b. Recall by the FDA

48. On April 1, 2020, the FDA requested the voluntary withdrawal of all Ranitidine-Containing Drugs from the market after it began reviewing the safety of ranitidine, with specific focus on the presence of NDMA.

### c. Dangers of NDMA

49. The US Department of Health and Human Services ("DHHS") opined that NDMA is reasonably anticipated to be a human carcinogen.[4]

50. The high levels of NDMA produced by Zantac are inherent to the molecular structure of ranitidine, the active ingredient in Zantac. The ranitidine molecule contains both a nitrite and DMA group which are well known to combine to form NDMA. Ranitidine produces NDMA by "react[ing] with itself," such that every dosage of ranitidine exposes consumers to NDMA.

---

[4] U.S. Envtl. Prot. Agency, Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)(Nov. 2017) https://www.eps.gov/sites/production/files/2017-10/documents/ndma_fact_sheet-update_9-15-17_508.pdf.

51. According to the U.S. Environmental Protection Agency ("EPA"), "NDMA is a semi volatile organic chemical that forms in both industrial and natural process[.]"[5] It is one of the simplest members of a class of N-nitrosamines, a family of potent carcinogens. Scientists have long recognized the dangers that NDMA poses to human health.

52. Both EPA and IARC classify NDMA as a probable human carcinogen.[6] Further, in 1978, LARC stated that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans."[7]

53. The World Health Organization states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[8]

**d. How Ranitidine Transforms into NDMA within Human Body**

54. The ranitidine molecule itself contains the constituent molecules to form NDMA.

55. Specifically, the O=N (Nitroso) on one side of the ranitidine molecule can combine with the H3C-N-CH3 (DMA) on the other wide to form NDMA.

56. The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the U.S. water supply. In 2003 alarming levels of NDMA

---

[5] Id.
[6] Id.; International Agency for Research on Cancer (IARC) – Summaries & Evaluations, N-NITROSODIMETHYLAMINE (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html.
[7] IARC, Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, Some N-Nitroso Compounds, Vol. 17, 151-152 (may 1978) (Emphasis Added).
[8] WHO, Guidelines for Drinking-Water Quality, N-Nitrosodimethylamine (NDMA)(3d ed. 2008), https://www.who.int/water_sanititation_health/dwq/chemicals/ndmasummary_2ndadd.pdf. (Emphasis Added).

1  in drinking water processed by wastewater treatment plants were specifically linked to
2  the presence of ranitidine.

3  57. Ranitidine leads to NDMA exposure in four ways: (1) formation of NDMA in the
4  human digestive system; (2) formation of NDMA due to an enzymatic reaction
5
6  throughout the human body; (3) formation of NDMA over time under normal storage
7  conditions and that increases significantly when exposed to heat; and (4) formation of
8  NDMA during manufacture.

9      1.  **NDMA Forms in The Human Stomach**
10  58. When the ranitidine molecule is exposed to the acidic environment of the
11
12  stomach, particularly when accompanied by nitrites (a chemical commonly found in
13  heartburn-inducing foods), the Nitroso molecule (O=N) and the DMA molecule (H3C-
14  N-CH3) break off and reform as NDMA.

15  59. In 1981, two years before the FDA approved Zantac, Dr. Silvio de Flora
16  published the results of experiments he conducted on ranitidine in the well-known
17
18  journal, The Lancet. When ranitidine was exposed to human gastric fluid in
19  combination with nitrites, his experiment showed "toxic and mutagenic effects[.]"[9] Dr.
20  Flora formed the hypothesis that these mutagenic effects could have been caused by
21  the "formation of more than one nitroso derivative [which includes NDMA] under our
22  experimental conditions." Id. Dr. Flora cautioned that, concerning ranitidine
23
24  ingestion, "it would seem prudent to ... suggest[s] a diet low in nitrates and nitrites, by
25  asking patients not to take these at times close to (or with) meals[.]" Id.

26

27  [9] Silvio de Flora, *Cimetidine, Ranitidine, and Their Mutagenic Nitroso Derivatives*, 318 THE LANCET
    8253, 993-94 Oct. 31, 1981.
28

60. Notwithstanding Dr. Flora's findings in 1981, GSK told the FDA in the early 1980's that the nitrite would not likely be formed in the stomach because an unrealistically large amount of nitrate needs to be present to form and maintain the nitrosamine. GSK even applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal."

61. Additionally, before Zantac was approved by the FDA, GSK admitted to the FDA that its own studies evidenced that ranitidine use caused the proliferation of bacteria in the human stomach known to concern nitrates to nitrites and elevated levels of nitrite in the stomach. While GSK did acknowledge that this could increase the risk of developing cancer, the risk was dismissed based on assumption about human eating habits at that time.

62. In response to Dr. Flora's findings, GSK conducted a clinical study in 1982 that purportedly tested for NDMA. However, the gold-standard mass spectrometry to test for NDMA was not utilized to support GSK's findings. Instead, GSK used a process that inefficiently measured N-nitrosamines. Even more telling, GSK failed to test the gastric samples that included ranitidine in them.

63. In 1983, Dr. Flora, along with four other researchers, published their complete findings regarding the genotoxicity of ranitidine.[10] Dr. Flora's team "confirm[ed] our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine[.]" emphasizing "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest that prudent adoption of some

[10] Silvio de Flora, et al., Genotoxicity of nitrosated ranitidine, 4 CARCINOGENESIS 3, 255-60 (1983).

simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals." Id.

64. The high instability of the ranitidine molecule was elucidated in multiple scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[11] These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

65. In 2016, researchers at Stanford University conducted an experiment by measuring the NDMA in urine of healthy persons over the course of 24 hours and administering one dose of ranitidine, then measuring the NDMA in the urine of the same volunteers for another 24 hours.[12] The study found that the level of NDMA generally increased by a staggering 400 times.

66. The Stanford study clearly proved that unsafe levels of NDMA are formed in the human body as a result of ranitidine ingestion.

67. On September 9, 2019, Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition calling for the recall of all Ranitidine-Containing Drugs due to scientific studies demonstrating that ranitidine can transform into the cancer-causing NDMA.

---

[11] Le Roux, et al, NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism, 46 Environ. Sci. Technol 20, 11095-103 (2012).
[12] Zeng, et al., Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine, 37 CARCINOGENESIS 625-34 (2016).

68. The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, as shown below in Table 1.

**Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol**

| 150 mg Tablets or Equivalent | Lot # | NDMA per tablet (ng) |
|---|---|---|
| Reference Powder* | 125619 | 2,472,531 |
| Zantac Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,234,798 |
| Wal-Zan, Walgreens | 79L80081 9A | 2,444,046 |
| Wal-Zan (mint), Walgreen | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mine), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mine), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,469 |

69. Valisure's testing shows, on average, 2,692,291 ng of NDMA in one 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at 28,000 times the legal limit. Smoking at least 6,200 cigarettes achieves the same levels of NDMA found in one 150 mg does of Zantac.

70. On September 26, 2019, Walgreens, Walmart, Rite-Aid, and Apotex Corp. – makers of generic OTC ranitidine, voluntarily recalled all Ranitidine-Containing Drugs and removed the drugs from the shelves.

71. On September 28, 2019, CVS Health Corp. announced that it would terminate the sale of Zantac and its own generic Ranitidine-Containing Drugs due to concerns that it might contain a carcinogen.

72. Sanofi voluntarily recalled all brand-name OTC Zantac on October 18, 2019.

73. The results of Valisure's tests on ranitidine tablets in biologically relevant conditions illustrate significant NDMA formations under simulated gastric conditions with nitrite present.

74. Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA's permissible limit. One would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one does of 150 mg Zantac at the 25 nanogram level (over 7,000 for the 50 nanogram level).

75. Assessed overall, the scientific data in literature demonstrates that the ingestion of ranitidine in the presence of human-relevant levels of nitrite in the stomach – a substance that is commonly found in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month – the ranitidine molecule breaks down into levels of NDMA that would dramatically increase a person's risk of developing cancer.

**2. Formation of NDMA in the Other Organ of Human Body**

76. Valisure's findings also identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

77. Computational modeling demonstrates that ranitidine can readily bind to the DADAH-lenzyme in a manner comparable to the natural substrate of DDAH-1 known as asymmetric dimethylarginine.

78. This is an indicator that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying orangs most susceptible to this action.

79. While DDAH-1 is most strongly expressed in the kidneys, it is broadly distributed throughout the body including the liver, prostate, stomach, bladder, brain, colon, and prostate. This distribution offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically causes concern for the NDMA's effects on numerous organs, such as the bladder.

80. The possible enzymatic reaction of ranitidine to DDAH-1, or other enzyme, suggests that high levels of NDMA can form throughout the human body – ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours. When the ranitidine interacts with the DDAH-1 enzyme in various orans throughout the body, it breaks down into NDMA, as validated by the Stanford Study.

### 3. Formation of NDMA by Exposure to Heat and/or Time

81. As indicated in Valisure's September 2019 Citizen Petition to the FDA the risk of creating NDMA by exposing ranitidine to heat is generally known and documented in the scientific community from the early 1980's.

82. In response to Valisure's Petition, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because

the contemporaneous "testing method does not use elected temperatures" and has been proven capable of detecting NDMA.

83. In or about early 2020, Emery Pharma ran a series of tests using FDA-recommended LC-HRMS protocol. During these tests, the researchers exposed ranitidine to 70 degrees Celsius at different periods of time. The results showed that increasing levels of NDMA formed based on exposure to heat. The researcher cautioned (emphasis added):

> **NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage.** More importantly, these conditions occur post-lot release by the manufacturer. Hence, while **NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of <u>consumption by the consumer.</u>**

84. Given these facts, in conjunction with the historical data from the 1980s, it is evident that during normal transport and storage, and especially when exposed to heat, the ranitidine molecule systematically breaks down into cancer causing NDMA, accumulating over tie in the finished product.

85. Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility, and even likelihood, of the drug accumulating dangerously high levels of NDMA prior to consumption is unreasonably high.

### 4. Ranitidine Exposure is Directly Linked to Cancer

86. In addition to studies examining how NDMA causes cancer in humans, researchers have also specifically linked ranitidine with cancer.

87. One epidemiology study, published in 2004, showed that men taking either ranitidine or cimetidine (Tagamet) experienced increased risks of bladder cancer.[13]

88. In another comprehensive epidemiological study that examined various cancer risks and H2 blockers, including ranitidine, the data showed that ranitidine consumption increased the risk of prostate, lung esophageal, pancreatic, and kidney cancer. Notably the study also indicated that people under the age of 60 that took ranitidine were fiver times more likely to contract prostate cancer.

89. A study published in 2018 demonstrated an increased risk of liver cancer associated with use of ranitidine in comparison with other histamine type 2 receptor antagonists (H2RAs) in the class.[14]

90. Another study in 2018 found an increased risk in hepatocellular carcinoma associated with use of H2RAs.[15] The authors evaluated the risk of cancer in association with proton pump inhibitors and looked at H2RAs as a confounder. Even narrowed to consideration of se of H2RAs within one year of cancer diagnosis, the study showed an increased odds ration associated with use of H2RAs and hepatocellular carcinoma, a type of liver cancer.

**5. Defendants Knew or Should Have Known of the NDMA Risk**

---

[13] D. Michaud, et al, Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prosective Study of Male Health Professionals, 13 CANCER EPI. BIOMARK. & PREV. 250-54, 252 (Feb. 2004)
[14] Kim Tu Tran, et al, Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies, 48 ALIMENTARY PHARMA & THERAP 1, 55-64 (2018)
[15] Shao, Y-HJ, et al., Association between proton pump inhibitors and the risk of hepatocellular carcinoma, 48 ALIMENTARY PHARMA & THERAP 4, 460-68 (2018)

91. When Plaintiffs purchased and ingested Ranitidine-Containing Drugs, Defendants knew or should have known that the weight of scientific evidence showed that Ranitidine-Containing Drugs exposed consumers to dangerous levels of NDMA.

92. Defendants failed to disclose this risk to consumers on the drug's label – or through any other means – and Defendants failed to report these risks to the FDA.

93. As early as 1981, scientific research was available that evidenced elevated rates of NDMA. This was known or should have been known by the Defendants when they began marketing, promoting, labeling, and selling Ranitidine-Containing Drugs.

94. Defendants concealed the dangerous hazards of ingesting Zantac and Ranitidine Containing drugs from consumers by neglecting to report it to the FDA, which in turn relies on manufacturers (and testing laboratories) to bring new information about approved drugs.

95. Manufacturers of an approved drug are required by regulations to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. Section 314.81(b)(2):

> The report is required to contain... [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

96. 21 C.F.R. Section 314.81(b)(2)(v) provides:

> The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

97. Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Ranitidine-Containing Drugs.

98. Knowledge regarding the risk of NDMA in ranitidine was sufficiently accessible in publicly available scientific literature that any maker or distributor, consistent with their heightened obligations to ensure the safety of their products, should have known about the potential NDMA risks associated with ranitidine consumption.

99. Defendants failed to warn the public and failed to conduct and/or publish share relevant studies or testing with the FDA and scientific community concerning the link between NDMA and Ranitidine-Containing Drugs.

100.    Defendants also knew that they are required by federal law to store, warehouse, and distribute pharmaceutical drugs in accordance with current "Good Manufacturing Practices" ("GMPs") to ensure they meet safety, quality, purity, identify, and strength standards. See 21 U.S.C. Section 351(a)(2)(B).

101.    21 C.F.R. Section 211.142(b) states that the GMPs required that warehousing of drug products shall be performing to ensure "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that they identity, strength, quality, and purity of the drug products are not affected." Stated differently, Defendants had a duty and were obligated to safely store, handle, and warehouse Ranitidine-Containing Drugs.

102.    The FDA's own testing demonstrated the following rudimentary facts that would have helped reduce the hazards of Ranitidine-Containing Drugs had Defendants invested their profits into testing and research: (a) improper storage of

Ranitidine-Containing Drugs has resulted in extremely high levels of NDMA; (b) NDMA can increase in Ranitidine-Containing Drugs even under normal storage conditions; (c) NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers; and (d) Ranitidine-Containing Drugs age the level of NDMA in the product increases.

103.    Based on these facts, other findings, and scientific research, the FDA concluded that these defects raised the level of NDMA in Ranitidine-Containing Drugs well above the safe daily intake limit to the point that Ranitidine-Containing Drugs had to be banned as of April 2020.

104.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

105.    A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[16]

106.    In 1981, Dr. Silvio de Flora published the results of his experiments showing that ranitidine was converting into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites – a substance

---

[16] Jane Brody, Bottoms Up: Alcohol in Moderation Can Extend Life, GLOBE & MAIL (CANADA), Oct. 11, 1979 (emphasis added); see Rudy Platiel, Anger Grows as Officials Unable to Trace Poison in Reserve's Water, GLOBE & MAIL (CANADA), Jan. 6, 1990 (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (MDMA), an industrial byproduct chemical that has been linked to cancer"); S.A. Kyrtopoulos, DNA addicts in Humans after Exposure to Methylating Agents, 405 MUTATION RES. 2, 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

commonly found in food and in the body, including floods that consumers were informed that they could consume shortly before or after ingesting ranitidine.[17]

107.   In a 2011 epidemiological study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women."[18]

108.   At all relevant times, Defendants failed to disclose to Plaintiffs and Plaintiff's healthcare providers, the scientific link between ranitidine and NDMA. More generally, Defendants also failed to disclose the scientific link to prescribing physicians or Ranitidine-Containing Drugs or the FDA.

### 6. Equitable Tolling

109.   The nature of Plaintiff's injuries in relation to Defendants' conduct was not discovered, and through reasonable care and due diligence, could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

110.   Within the period of any applicable statutes of limitation, Plaintiffs were unaware and could not have discovered through the exercise of reasonable diligence that Defendants were not disclosing the dangerous levels of the carcinogen NDMA produced by Ranitidine-Containing Drugs, including Zantac.

111.   Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations,

---

[17] Silvio de Flora, Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives, 318 LANCET 8253, 993-94 (Oct. 31, 1981).
[18] Yet Hua Loh et al., N-nitroso Compounds and Cancer Incidence: The European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study, 93 AM. J. CLINICAL NUTRITION 5, 1053-61 (May 2011).

including equitable tolling, delayed discovery, discovery rules, and/or fraudulent concealment.

112. At all relevant times, Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Ranitidine-Containing Drugs, including Zantac, and never disclosed this risk to the FDA or the consuming public.

113. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to Plaintiffs' claims.

**CAUSES OF ACTION**
**COUNT I: STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
**(Against Manufacturer Defendants)**

114. Plaintiffs incorporate by reference each allegation set forth in proceeding paragraphs as if fully stated herein.

115. At all times relevant, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and promoting Ranitidine-Containing Drugs, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Ranitidine-Containing Drugs and NDMA. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Ranitidine-Containing Drugs and aimed at a consumer market.

116.     The Ranitidine-Containing Drugs had potential risks that Defendants knew or were knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture.

117.     The potential risk of cancer presented a substantial danger when Ranitidine-Containing Drugs are used in an intended and/or reasonably foreseeable way.

118.     Ordinary consumers would not have been able to recognize the potential risks of cancer as a result of ingesting Ranitidine-Containing Drugs.

119.     Defendants failed to adequately warn of potential risks from Ranitidine-Containing Drugs. During the time period Plaintiff ingested and/or was exposed to Ranitidine-Containing Drugs, the warning associated with the product were incomplete, vague, otherwise inadequate and failed to notify consumers to the health risks, including risks of cancer, stemming from the use of such Ranitidine-Containing Drugs.

120.     The lack of sufficient warning was a substantial factor in causing Plaintiff's harm. As a result of the lack of sufficient warning, Plaintiffs chose to ingest these drugs, which caused Plaintiffs' conscious pain, suffering, bodily impairment, including stomach cancer, and death.

121.     As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Ranitidine-Containing Drugs, Plaintiffs has been injured, sustained severe and permanent pain, suffering, disability, bodily impairment, including stomach cancer, and death.

## COUNT II: STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Against Manufacturer Defendants)

122.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

123.    At all times relevant, Defendants have been in the business of designing, manufacturing, labeling, marketing, promoting, selling, inspecting, handling, storing, and distributing defective Ranitidine-Containing Drugs to consumers.

124.    At all times relevant, Defendants' Ranitidine-Containing Drugs have contained unreasonably dangerous design defects, including, but not limited to, grave risks that may follow the foreseeable use of Ranitidine-Containing Drugs.

125.    At all times relevant, Defendants had a duty to ensure that Ranitidine-Containing Drugs did not pose unreasonable and dangerous risks to consumers.

126.    Ranitidine-Containing Drugs did not perform as safety as an ordinary consumer would have expected when used in an intended and foreseeable manner.

127.    Plaintiff was harmed and subsequently died by ingesting defective and unreasonably dangerous Ranitidine-Containing Drugs without knowledge of the grave risks of cancer and other serious illnesses.

128.    The Ranitidine-Containing Drugs' failure to operate safely was a substantial factor in causing Plaintiffs' harm and death. Plaintiff ingested these drugs, which caused Plaintiffs' conscious pain, suffering, bodily impairment, stomach cancer, and death.

## COUNT III: NEGLIGENT MISREPRESENTATION
### (Against Manufacturer Defendants)

129.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

130.     While representing carcinogenic Ranitidine-Containing Drugs as safe, Manufacturer-Defendants failed to employ manufacturing methods that ensured Ranitidine-Containing Drugs met the quality and purity characteristics they purported to possess.

131.     As early as 1981, scientific research was available that evidenced elevated rates of NDMA. This was known or should have been known by the Defendants when they began marketing, promoting, labeling, ad selling Ranitidine-Containing Drugs.

132.     Defendants failed to disclose this risk to consumers on the drug's label – or through any other means – and Defendants failed to report these risks to the FDA.

133.     The public, including Plaintiffs, justifiably relies on information from the FDA and drug labels, as well as medical providers, to communicate potentially life-altering risks of exposure and/or ingestion of medications.

134.     As a result of Defendants' representation of the safety of Ranitidine-Containing Drugs, Plaintiffs chose to ingest these drugs, which caused Plaintiffs' conscious pain, suffering, disability, including stomach cancer, and death.

## COUNT IV: FRAUDULENT CONCEALMENT
### (Against Manufacturer Defendants)

135.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated therein.

136.    Despite the available scientific evidence of elevated rates of NDMA in Ranitidine-Containing Drugs, Defendant concealed the dangerous hazards of ingesting Zantac and Ranitidine-Containing Drugs from consumers by failing to report it to the FDA. The FDA relies on manufacturers to present new and updated information regarding approved drugs. The public, including Plaintiffs, in turn depends on the FDA to make this information accessible to them.

137.    Manufacturers of an approved drug are required by regulations to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to C.F.R. Section 314.81(b)(2) and 21 C.F.R. Section 314.81(b)(2)(v).

138.    In addition to failing to report these significant risks to the FDA, the Manufacturer-Defendants deliberately concealed grave risks when marketing and promoting Ranitidine-Containing Drugs that were known to the Defendant Manufacturers but unknown to Plaintiffs. These concealments were motivated by Manufacturers' desire to profit from Ranitidine Containing Drugs by representing to consumers that they were safe. Defendants were aware that full disclosure of the true life-threatening risks would likely cause the FDA recall long before April 1, 2020.

139.    Plaintiffs would not have ingested the Ranitidine-Containing Drugs had Plaintiffs been aware of the severity of these risks.

140.    As a direct result of ingesting these drugs, Plaintiffs experienced conscious pain and suffering and bodily impairment, including but not limited to stomach cancer and death, resulting from the ingestion and/or exposure to Ranitidine-Containing Drugs.

## COUNT V: NEGLIGENT MANUFACTURE
### (Against Manufacturer Defendants)

141.    Plaintiffs hereby incorporate by reference the allegations contained in the proceeding paragraphs of the Complaint as if fully stated herein.

142.    Defendants distributed, marketed and/or sold Ranitidine-Containing Drugs to consumers within Los Angeles County.

143.    At all times relevant, Defendants knew or, in the exercise of reasonable care, should have known, that Ranitidine-Containing Drugs were dangerous when used in a reasonably foreseeable manner.

144.    At all times relevant, Defendants knew or should have known, in the exercise of reasonable care, that Ranitidine-Containing Drugs had been contaminated with an industrial chemical known to cause cancer.

145.    At all times relevant herein, Defendants had a duty to exercise care in providing OTC providers with (a) specific directions for safe use of Ranitidine-Containing Drugs; (b) accurate, true, and correct information concerning the potential adverse effects of Ranitidine-Containing Drugs as directed; and (c) appropriate, complete, and accurate warnings concerning the potential adverse effects of Ranitidine-Containing Drugs when used as intended, including the drugs' ability to transform into a carcinogen compound, NDMA, through a means that could reasonably be expected to reach foreseeable users and consumers. Defendants had a duty to provide adequate warnings while Ranitidine-Containing Drugs remained on the market.

146.    At all times relevant, Defendants had a further duty to avoid tendering into the marketplace a product which Defendants knew, or should have known, posed risks outweighing its benefits or which they knew, or should have known, was dangerous and unfit for ingestion by anyone.

147.    Defendants' duty included exercising reasonable care to cease marketing and to discontinue Ranitidine-Containing Drugs when Defendants knew, or had reason to know, that the product should not be used for any purpose considering the relative risks.

148.    Defendants knew or reasonably should have known that consumers would not be aware of the danger or the carcinogenic properties of Ranitidine-Containing Drugs when ingested.

149.    Defendants failed to adequately warn of the danger of the consumption of Ranitidine Containing Drugs.

150.    A reasonable manufacturer, distributor, or seller under the same or similar circumstances would have warned of the danger of the consumption of Ranitidine-Containing Drugs.

151.    Defendant also breached their duty of care by failing to undertake sufficient studies and conduct necessary tests to determine whether Ranitidine-Containing Drugs were safe for their intended and foreseeable consumer use.

152.    Defendants further breached their duty of care and were negligent in that while representing carcinogenic Ranitidine-Containing Drugs as safe. Defendants failed to employ manufacturing methods that ensured Ranitidine Containing Drugs met the quality and purity characteristics they purported to possess.

153. Defendants' breach of duty to Plaintiffs was a substantial factor in causing Plaintiffs' harm and death.

### COUNT VI: NEGLIGENCE
### (Retailer Defendants and DOE Defendants)

154. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

155. Defendants sold, handled, and stored Ranitidine-Containing Drugs within Los Angeles County.

156. At all times relevant, Defendants knew, or in the exercise of reasonable care should have known, of the hazards and dangers associated with Ranitidine-Containing Drugs' intended or foreseeable use.

157. At all times relevant times herein, Defendants knew, or in the exercise of reasonable care should have known, that Ranitidine-Containing Drugs' carcinogenic properties cause them to be so dangerous that they should not have been purchased or consumed by anyone.

158. At all times relevant herein, Defendants knew or should have known of the carcinogenic properties of NDMA when Ranitidine Containing Drugs are ingested and/or the elevated levels of NDMA that result from the transport, handling, and storage of Ranitidine Containing Drugs.

159. Defendants were charged with a continuing duty to provide appropriate and accurate instructions regarding the proper expiration and retest dates, as well as storage and handling of Ranitidine Containing Drugs.

160.     Defendants had a duty to exercise ordinary care in storing ranitidine according to the temperature requirements on the label or otherwise informed of Defendants' breach of their duty by failing to adhere to the established practices and procedures in storing Ranitidine-Containing Drugs. Ranitidine leads to NDMA exposure through the formation of NDMA over time under normal storage conditions and that increases significantly when exposed to heat. Defendants had a duty to exercise ordinary care in storing ranitidine in a way so as to avoid the formation of NDMA.

161.     Defendants' breach of duty was a substantial factor in causing Plaintiffs' harm and death.

### COUNT VII: WRONGFUL DEATH
### (Against Manufacturer Defendants)

162.     Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

163.     Survival and Wrongful Death Plaintiffs are the surviving heirs, successors in interest and/or personal representatives of the Decedent who used Ranitidine-Containing Drugs and was injured and died as a result.

164.     The injures and damage of the Plaintiffs and Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentation of Defendants.

165.     As a result of the conduct of Defendants and the Decedent's use of Ranitidine-Containing Products the Decedent suffered fatal injuries.

166.     As a result of the death of Decedent, Plaintiffs were deprived of love companionship, comfort, support, affection, society, solace, and support of Decedent.

167.     Plaintiffs are entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Ranitidine-Containing Products and the negligent conduct, acts, errors, omissions, and intentional and negligent misrepresentation of Defendants, and each of them.

### COUNT VIII: SURVIVAL ACTION
### (Against All Defendants)

168.     Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

169.     Decedent incurred special damages in the form of the reasonable value of services rendered for medical care for the injuries that Decedent sustained prior to death, all caused by the Decedent's exposure to Ranitidine-Containing Products. Survival and Wrongful Death Plaintiffs are the heirs, personal representatives, and/or successors in interest and are authorized to bring this survival action on behalf of the Decedent's estate pursuant to Code of Civil Procedure Section 377.31, et seq.

170.     Plaintiffs incurred special damages for losses sustained by the Decedent in the form of the reasonable value of services rendered for medical care for the injuries sustained by the Decedent prior to death, lost earnings, and other special damages.

171.     As a direct and proximate cause result of consuming Ranitidine-Containing Drugs and the conduct of Defendants, Plaintiffs and Decedent sustained the damages as set forth above.

172.     Plaintiffs demand a trial by jury on all the triable issues within this pleading.

173.    WHEREFORE, Plaintiffs request this Court enter judgment in Plaintiffs' favor and against the Defendants for:

    a. Actual or compensatory damages in such amount to be determined at trial and as provided by law;

    b. Exemplary and punitive damages sufficient to punish and deter the Defendants and other from future wrongful practices;

    c. Pre-judgment interest and post-judgment interest;

    d. Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    e. any other relief the Court may deem just and proper.

Dated: September 1, 2021          **LAW OFFICES OF DAVID F. CALKINS**

                                     DAVID F. CALKINS
                                     Attorney for Plaintiff Marlene Boyadjian,
                                     Individually and on behalf of the estate
                                     of Saliba Boyadjian

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>David F. Calkins - State Bar Number 314294<br>Law Offices of David F. Calkins - 500 N. Brand Blvd., Suite 2000, Glendale, CA 91203<br><br>TELEPHONE NO: (818) 392-8222   FAX NO. *(Optional):* (888) 395-0098<br>E-MAIL ADDRESS  david@calkinslaw.com<br>ATTORNEY FOR *(Name):*  Plaintiff Marlene Boyadjian | **FOR COURT USE ONLY** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS 111 N. Hill Street
MAILING ADDRESS
CITY AND ZIP CODE Los Angeles, 90012
BRANCH NAME Central District - Stanley Mosk Courhouse

**CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles**

**SEP 07 2021**

Sherri R. Carter, Executive Officer/Clerk of Court

By: Kristina Vargas, Deputy

**CASE NAME:**
Boyadjian v. GlaxoSmithKline, LLC, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | **CASE NUMBER** |
|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **21STCV32966**<br>JUDGE<br>DEPT. |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
**(Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [X] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* 8 (Eight)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 09/02/2021
David F. Calkins
_____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std 3.10
www.courts.ca.gov

To Plaintiffs and Others Filing First Papers. If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

To Parties in Rule 3.740 Collections Cases. A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

To Parties in Complex Cases. In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Boyadjian v. GlaxoSmithKline, LLC, et al. | **21STCV32966** |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 7 _____ ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4: Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.**

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3.④, 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

| SHORT TITLE: Boyadjian v. GlaxoSmithKline, LLC, et al. | | CASE NUMBER | |
|---|---|---|---|

| | **A**<br>Civil Case Cover<br>Sheet Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional<br>Negligence<br>(25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination<br>(36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment<br>(15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/<br>Warranty<br>(06)<br>(not Insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections<br>(09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage<br>(18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract<br>(37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent<br>Domain/Inverse<br>Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2. |
| | Wrongful Eviction<br>(33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property<br>(26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Judicial Review Unlawful Detainer** | Unlawful Detainer-<br>Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-<br>Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-<br>Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration<br>(11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Boyadjian v. GlaxoSmithKline, LLC, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151 Writ - Administrative Mandamus<br>☐ A6152 Writ - Mandamus on Limited Court Case Matter<br>☐ A6153 Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141 Sister State Judgment<br>☐ A6160 Abstract of Judgment<br>☐ A6107 Confession of Judgment (non-domestic relations)<br>☐ A6140 Administrative Agency Award (not unpaid taxes)<br>☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112 Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030 Declaratory Relief Only<br>☐ A6040 Injunctive Relief Only (not domestic/harassment)<br>☐ A6011 Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121 Civil Harassment<br>☐ A6123 Workplace Harassment<br>☐ A6124 Elder/Dependent Adult Abuse Case<br>☐ A6190 Election Contest<br>☐ A6110 Petition for Change of Name<br>☐ A6170 Petition for Relief from Late Claim Law<br>☐ A6100 Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

CIV 109 03-04 (Rev. 03/08)
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

| SHORT TITLE:<br>Boyadjian v. GlaxoSmithKline, LLC, et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C<br>WHICH APPLIES IN THIS CASE<br><br>☐1. ☐2. ☐3. ☑4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>17730 Lassen Street | |
|---|---|---|
| CITY:<br>Northridge | STATE:<br>CA | ZIP CODE:<br>91325 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk     courthouse in the Central      District of the Los Angeles Superior Court  (Code Civ. Proc. § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: 9/2/2021

(SIGNATURE OF ATTORNEY/FILING PARTY)

---

### PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LASC Approved CIV 109 03-04 (Rev. 03/06).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

CM-015

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address)*<br>David F. Calkins - State Bar Number 314294<br>Law Offices of David F. Calkins<br>500 N. Brand Blvd., Suite 2000<br>Glendale, CA 91203<br>TELEPHONE NO. 818-392-8222    FAX NO *(Optional)* 888-395-0098<br>E-MAIL ADDRESS *(Optional)*  david@calkinslaw.com<br>ATTORNEY FOR *(Name)*  Plaintiff Marlene Boyadjian | **FOR COURT USE ONLY**<br><br>CONFORMED COPY<br>ORIGINAL FILED<br>Superior Court of California<br>County of Los Angeles<br><br>SEP 07 2021<br><br>Sherri R. Carter, Executive Officer/Clerk of Court<br>By: Kristina Vargas, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS   111 N. Hill Street
MAILING ADDRESS
CITY AND ZIP CODE   Los Angeles, 90012
BRANCH NAME   Central District - Stanley Mosk

PLAINTIFF/PETITIONER: Marlene Boyadjian

DEFENDANT/RESPONDENT: GlaxoSmithKline, LLC, et al.

21STCV32966

JUDICIAL OFFICER

DEPT:

| **NOTICE OF RELATED CASE** |
|---|

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: JCCP 5150: Ranitidine Product Cases
   b. Case number: RG20073766 RG200773321 RG20073622, RG20073289 RG20073737 RG20073452, et al.
   c. Court: ☐ same as above
            ☑ other state or federal court *(name and address):* Superior Court of California, County of Alameda
   d. Department: Complex Coordinated Proceedings
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*
   f. Filing date: 11/5/2020
   g. Has this case been designated or determined as "complex?" ☑ Yes ☐ No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      ☑ Involves the same parties and is based on the same or similar claims.
      ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
      ☑ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: ☐ same as above
            ☐ other state or federal court *(name and address):*
   d. Department:

CM-015

| PLAINTIFF/PETITIONER:   Marlene Boyadjian | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: GlaxoSmithKline, LLC, et al. | |

2. *(continued)*

e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

f. Filing date:

g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

h. Relationship of this case to the case referenced above *(check all that apply):*

    ☐ involves the same parties and is based on the same or similar claims.

    ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

    ☐ involves claims against, title to, possession of, or damages to the same property.

    ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 2h

i. Status of case:

    ☐ pending

    ☐ dismissed ☐ with ☐ without prejudice

    ☐ disposed of by judgment

3. a. Title:

  b. Case number:

  c. Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

  d. Department:

  e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*

    ☐ involves the same parties and is based on the same or similar claims.

    ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

    ☐ involves claims against, title to, possession of, or damages to the same property.

    ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 3h

  i. Status of case:

    ☐ pending

    ☐ dismissed ☐ with ☐ without prejudice

    ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 9/2/2021

David F. Calkins
<br>(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶

(SIGNATURE OF PARTY OR ATTORNEY)

**NOTICE OF RELATED CASE**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Spring Street Courthouse, Department 11

21STCV32966                                                October 19, 2021
MARLENE BOYADJIAN vs GLAXOSMITHKLINE, LLC, et                    3:58 PM
al.

Judge: Honorable David S. Cunningham        CSR: None
Judicial Assistant: M. Cervantes            ERM: None
Courtroom Assistant: C. Concepcion          Deputy Sheriff: None

---

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

---

**NATURE OF PROCEEDINGS:** Court Order

The Court sets this matter for hearing as follows: Order to Show Cause Re: Whether or Not This Case Should be Added to Judicial Council Coordinated Proceedings No. 5150 is scheduled for 12/03/2021 at 10:00 AM in Department 11 at Spring Street Courthouse.

Any response to the Order to Show Cause is to be filed five court days before the hearing.

Counsel for Plaintiff is to give notice.

Certificate of Mailing is attached.

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| **COURTHOUSE ADDRESS:**<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**10/19/2021**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By:        M. Cervantes        Deputy |
| **PLAINTIFF/PETITIONER:**<br>Marlene Boyadjian | |
| **DEFENDANT/RESPONDENT:**<br>Glaxosmithkline, LLC et al | |
| **CERTIFICATE OF MAILING** | **CASE NUMBER:**<br>21STCV32966 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order) of 10/19/2021 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

David F. Calkins
Calkins Law
500 N Brand Blvd Ste 2000
Glendale, CA  91203

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: <u>10/19/2021</u>

By:  <u>M. Cervantes</u>
        Deputy Clerk

**CERTIFICATE OF MAILING**